IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAHAMUD TOOXOOW MAHAMED,<br><br>Defendant. | No. 19-05042-01-CR-SW-RK |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by R. Matthew Price, United States Attorney, and Ami Harshad Miller, Assistant United States Attorney, and the defendant, Mahamud Tooxoow Mahamed ("the defendant"), represented by Ian Lewis, Supervisory Assistant Federal Public Defender.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count One of the superseding indictment. Count One charges him with a violation of 18 U.S.C. § 1201(a)(1), that is, kidnapping resulting in death. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is, in fact, guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

The defendant admits that beginning on or about July 16, 2019, through July 29, 2019, said dates being approximate, in McDonald County, and elsewhere in the Western District of Missouri, he did unlawfully and willfully seize, confine, inveigle, decoy, kidnap, abduct, and hold Jessica McCormack for some reason that he considered of sufficient benefit to him, or for some purpose of his own, and in the course of such conduct the defendant used the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense, and such conduct did result in the death of Jessica McCormack.

On July 16, 2019, law enforcement officers with the Noel, Missouri, Marshal's Office (NPD) contacted Jessica McCormack and her three children at 229 Main Street, Noel, Missouri. McCormack's three children were identified as four-year-old Jane Doe 1, two-year-old Jane Doe 2, and six-month-old Jane Doe 3. McCormack called 9-1-1 on July 16, 2019, at 7:01 a.m. and stated that the defendant, Mahamud Tooxoow Mahamed, her paramour, had held her at knife point and tried to force her to have sexual intercourse with him. McCormack repeatedly reported to the 9-1-1 operator that she was worried that Mahamed will harm her three children who were in the apartment with him. McCormack noted that she was outside and needed to go back into the apartment for her children's sake, but the 9-1-1 operator asked her to remain outside to guide arriving law enforcement. McCormack told the 9-1-1 operator that Mahamed had a knife and had more knives in the apartment. Near the end of the call, McCormack stated that Mahamed had come outside and was with her. McCormack was overheard stating, "Tito, I just did it for your own good," and then she said, "he's going to go up. Tito stop, please don't. He's going upstairs to the kids now, come on!" McCormack was overheard screaming, "Tito, stop, Tito, my kids, Tito stop!" Officers contacted McCormack in scene, and Mahamed was observed fleeing the apartment. This was the last time McCormack was observed alive, and the last time anyone reported observing the Jane Does in Missouri.

On July 16, 2019, Megan Bailey went to McCormack's apartment but could not locate McCormack or her girls. Bailey knocked on the door and could hear noise, but no one came to answer the door. On July 16, 2019, at 9:34 p.m. Bailey called the Missouri Social Service's Children's Division Hotline to report a safety concern. Bailey reported that she went to pick up McCormack's children, but when she knocked on the door no one answered. On the following day, July 17, 2019, Bailey returned to the apartment again and when Bailey knocked on the door, no one answered.

On July 17, 2019, at 1:14 p.m., Kendra Baker called McDonald County, Missouri, 9-1-1 dispatch to report that she had been unable to contact McCormack since July 16, 2019. Baker stated she was in Jefferson City, Missouri, but she had not been able to contact McCormack via phone. The last time Baker spoke with McCormack was on the morning of July 16, 2019. NPD Marshal Randy Wilson was dispatched at to McCormack's apartment at 1:18 p.m.; however, no one answered the door. On July 17, 2019, Children's Division Case Worker Angela Bridges responded to McCormack's apartment to make contact, but no one answered the door. On July

2

18, 2019, Ms. Bridges returned to McCormack's apartment and Sarah (Faust) Ritter answered the door. Ritter stated that McCormack and Mahamed were no longer living at the apartment, and she did not know where they were.

On July 29, 2019, the McDonald County, Missouri, Sheriff's Office (MCSO) received a report of a deceased body that was located off of Missouri Highway 59 between Lanagan, Missouri, and Noel, Missouri, a location within the Western District of Missouri. The reporting party, G.H., reported he observed a pink suitcase with feet sticking out in a ditch on the roadside. Corporal B. Ernest responded to the scene, and G.H. pointed out where the suitcase was. Upon inspection, Cpl. Ernest located a pink suitcase with a decomposed body. The deceased female was located in a partially unclothed state next to the suitcase. She had a pink tank top on that was pushed up to her shoulder area. The head was severely decomposed with no skin on it. The body and the suitcase were in a ditch next to a bluff hidden from the highway and passing traffic by tall grass. It appeared that the suitcase had fallen from the bluff and the zipper had been ripped. The deceased was later identified by DNA analysis to be McCormack.

On approximately July 28, 2019, or July 29, 2019, Rahma Ahmed, the defendant's cousin, received a phone call from Mahamed. Mahamed told her he was bringing his other three daughters to her in Minnesota. When Ahmed asked why he was bringing the girls, Mahamed noted that something bad had happened and he could be in trouble.

On August 1, 2019, Mahamed and the Jane Does arrived at Habiba Muse's residence in Rochester, Minnesota. Mahamed told Muse that he and the Jane Does had nowhere to go, so Muse gave Mahamed $50 to help with the Jane Does. Mahamed and the Jane Does went back to Muse's residence on August 3, 2019. Muse stated that Mahamed tried to leave the Jane Does with her. Mahamed stated he and the kids would have to sleep at the bus stop, so Muse gave him $100 so they would have somewhere to stay. Muse gave them a ride to a motel and Mahamed checked in around 12:00 a.m. at a Super 8. Rochester, Minnesota, police officers responded to the Super 8 located at 21st Street SE. The motel manager provided a copy of the surveillance footage from August 4, 2019, and a copy of Mahamed's driver's license he provided at check in. In the video, Mahamed was observed checking in with Muse at approximately 12:36 a.m. on August 4, 2019. Mahamed is seen checking out the next day at approximately 11:00 a.m., and the children are visible on the footage.

On August 8, 2019, the Jane Does were recovered at Malyun Koliso's residence in Des Moines, Iowa. Koliso reported that on August 5, 2019, Mahamed arrived at her residence with the Jane Does between 6:00 p.m. and 7:00 p.m. Koliso reported that on August 8, 2019, at approximately 4:00 a.m., she awoke to the children crying. When she got out of bed, she discovered that Mahamed was not in the residence. Koliso stated that she found a note from Mahamed informing her that he could not care for the children and had left.

Ritter later reported to law enforcement that Mahamed had told her McCormack left with the kids, and he did not know where they had gone. Mahamed told Ritter that she could stay in the Noel apartment. Ritter stated she saw Mahamed every day from the time she returned to the apartment on July 18, 2019, to McCormack's body being located on July 29, 2019. Facebook messages

3

between Mahamed (Facebook profile name Wabar Warsangali and Facebook user ID 100038585611826) and Ritter's corroborated her statements. Additionally, Ritter noted that after McCormack's body was located, she began asking Mahamed where the Jane Does were via Facebook Messenger messages, both text and voice messages. On August 7, 2019, Ritter asked Mahamed if he knew where the Jane Does were and if they were okay. To that, Mahamed sent a voice message through Facebook Messenger stating,

> Sweetheart I'm trying to find them all. Uh, like, cops don't know, nobody knows. They're talking about, fucking, they think that, uh, the lady in the suitcase is her. I, they're saying all kinds of different things. I'm just hoping and praying that my kids and my wife are good. They're safe. And I'm trying to, trying to find them. Please keep trying to find her. I text her, I said please everybody is trying to help you, nobody is against you. If you're, if you're safe that's all we want to know. I, nobody even wants to know where you at, it's just the safety of her and the kids is what everybody is worried about, so.

Mahamed continued to send messages to Ritter stating he hoped his kids are okay, and he sent a message on August 8, 2019, asking Ritter, "who the fuck has my kids?" Law enforcement also located messages sent by Mahamed using the same account, Wabar Warsangali (Facebook: 100038585611826), to an account that had been utilized by McCormack. On August 7, 2019, at 4:51 p.m., Mahamed sent a message stating, "Hey Jess please tell me you are ok, and the kids are too and please answer everybody is trying to know if you are ok please let me know bae I'm worried sick here."

Sometime in or after August 2019, and before September 19, 2019, Mahamed left the United States and began residing in Guatemala. Mahamed was located by Guatemalan law enforcement, and on July 27, 2021, he was expelled by the Guatemalan government from Guatemala. On July 27, 2021, FBI SA Cameron Heath and SA Doug McKelway accepted custody of Mahamed at the La Aurora International Airport and transported him back to the United States.

On August 14, 2019, MCSO and Federal Bureau of Investigation (FBI) Special Agent (SA) Stacy Moore executed a search warrant for various locations including a Buick Le Sabre that was identified to be a vehicle used by Mahamed and McCormack. FBI Emergency Response Team (ERT) processed the Buick. From the Buick, FBI recovered 22 items, including a bag of clothing smelling like ammonia. The clothing had blood stains on them that tested presumptive positive for blood. The trunk's carpeted area also tested presumptive positive for blood. All items from the vehicles were sent to the FBI lab in Quantico for testing.

On February 11, 2022, Erica Ames with the FBI Laboratory DNA support unit concluded her DNA analysis. A cardboard sign from a trash bag in the trunk of the Buick LeSabre, had a bloodstain near the right edge of the sign. The DNA profile obtained from the bloodstain was 69 billion times more likely if it originated from McCormack than any other individual. The trash bag the sign was located in, had a bloodstain on the outside. The DNA profile was 10 sextillion times more likely if McCormack was a contributor. A bra inside the plastic trash bag had a

4

bloodstain on the inside right side. The DNA profile was 3.3 sextillion times more likely if McCormack was a contributor.

On January 20, 2023, SA Moore contacted Eric Hudson and interviewed him in Noel. Hudson advised that he previously worked at the African Store in Noel, Missouri. Hudson worked there for a few years until it closed on December 28, 2020. Hudson performed various duties, including working the cash register. Hudson stated that a lot of the merchandise in the store came from Minneapolis. Employees would travel to Minneapolis to bring the items to Noel. Other merchandise came from overseas, such as China and Turkey. SA Moore asked Hudson if he knew Mahamed and Hudson stated he did. Hudson stated McCormack was Mahamed's girlfriend. Hudson recalled Mahamed purchasing a pink suitcase from him at the African Store. Hudson could not recall the exact date, but knew it was purchased prior to McCormack's body being discovered. Hudson stated the suitcase had rollers and a handle. Hudson pulled up a picture of a similar suitcase on the Internet and showed it to SA Moore. Hudson distinctly recalled Mahamed purchased the last suitcase in inventory, and Mahamed paid $60 cash for the suitcase. SA Moore showed Hudson a picture of the suitcase located next to McCormack's body, and Hudson stated it was the same color and style as the suitcase he sold Mahamed. A short time after selling the suitcase to Mahamed, Hudson recalled Mahamed was having trouble starting his van. Hudson tried to help Mahamed and told him he needed a new ignition switch for the van. Hudson recalled Mahamed acting desperate during this encounter.

On January 25, 2023, SA Moore contacted Luul Ahmed, who reported she was the owner of the African Stores in Noel, Minneapolis, Sioux City (South Dakota), and Skylar (Nebraska). Luul Ahmed confirmed that the store in Noel had closed. Luul Ahmed reported she was responsible for procuring all the products sold in her stores. Luul Ahmed recalled selling suitcases in the Noel store and stated she purchased them from a vendor in Los Angeles, California.

FBI SA Moore confirmed that Facebook utilizes the Internet or a cellular network to function. FBI SA Moore also confirmed that the Buick LeSabre was manufactured outside the state of Missouri and would have had to cross state lines to enter.

4. **<u>Use of Factual Admissions and Relevant Conduct.</u>** The defendant acknowledges, understands, and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands, and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as

5

"relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

5. **Statutory Penalties.** The defendant understands that, upon his plea of guilty to Count One of the superseding indictment, charging him with kidnapping resulting in death, the minimum penalty the Court may impose is not less than a life term of imprisonment, not more than five (5) years' supervised release, a $250,000 fine, and a $100 mandatory special assessment per felony count of conviction, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class A felony.

6. **Sentencing Procedures.** The defendant acknowledges, understands, and agrees to the following:

    a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission. While these Guidelines are advisory in nature, and the Court ordinarily would have the discretion to impose a sentence either less than or greater than the court-determined advisory Guidelines range, in this instance the parties agree, pursuant to Rule 11(c)(1)(C), that the Court must impose sentence as follows: *a term of imprisonment in the Bureau of Prisons on Count 1 to 360 months (30 years), followed by a five-year term of supervised release*. If the Court accepts this plea agreement, it must inform the defendant that sentence will be imposed in accordance with this agreement of the parties. If the Court rejects this plea agreement, it must, on the record and in open court, inform the parties that the Court rejects the plea agreement, advise the defendant personally that because the Court is rejecting the plea agreement the Court is not required to impose sentence in accordance with the agreement of the parties, give the defendant an opportunity to withdraw defendant's guilty plea, and further advise the defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the plea agreement contemplated;

    b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

    c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to five years;

d.  if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to five years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed five years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

e.  any sentence of imprisonment imposed by the Court will not allow for parole;

7.  **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to stalking or kidnapping of Jessica McCormack. The Government agrees to dismiss Counts 2 and 3, as well as the original indictment, at the time of sentencing. The State of Missouri, through the McDonald County, Missouri, Prosecuting Attorney, agrees to dismiss the pending charges of sodomy in the first degree and unlawful use of a weapon in case number 17MC-CR00680-01 and agrees not to file charges related to the kidnapping, stalking, or homicide of Jessica McCormack. Furthermore, the government agrees that if at any time it becomes legally possible for the defendant to be eligible for a "treaty transfer" pursuant to 18 U.S.C. § 4100 back to his country of origin, Somalia, the government will not oppose such a motion made by the defendant.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

7

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant=s plea of guilty and

8

its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw defendant's pleas of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. However, if the court accepts this Rule 11(c)(1)(C) plea agreement, the Court is bound to impose the sentence agreed to by the parties, as set forth in paragraph 6 above;

    b. The applicable Guidelines section for the offense of conviction for Count One is U.S.S.G. § 2A4.1, which provides for a base offense level of 32;

    c. There are no agreements to any enhancements or cross-references;

    d. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a 3-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will make a motion with the Court to that effect, unless the defendant: (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty pleas, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

    e. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

    f. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these

9

stipulations will not, as outlined in paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

        g.        The defendant and the United States confirm that the agreed sentence set forth in paragraph 6 above is both reasonable and authorized by law;

        h.        The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

        i.        The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed upon Guidelines calculations contained in this agreement.

11.    **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge, and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12.    **Change in Guidelines Prior to Sentencing.** The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

10

13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

   a. oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

   b. comment on the evidence supporting the charges in the superseding indictment;

   c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court does not impose the sentence agreed to by parties in this agreement; and

   d. oppose any post-conviction motions for reduction of sentence, or other relief.

14. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

   a. the right to plead not guilty and to persist in a plea of not guilty;

   b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

   c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

   d. the right to confront and cross-examine the witnesses who testify against him;

   e. the right to compel or subpoena witnesses to appear on his behalf; and

   f. the right to remain silent at trial, in which case his silence may not be used against him.

11

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to felony offenses and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

15. **Waiver of Appellate and Post-Conviction Rights.**

    a. The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

    b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

    a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the indictment which are to be dismissed and all other uncharged, related criminal activity;

12

b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine;

c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full;

d. Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility;

e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution;

f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence;

g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $ 100.00 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing;

h. The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future; and

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure

statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

17. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18. **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of

14

this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

20. **Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice, and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his plea of guilty.

21. **Immigration Consequences.** The defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. Indeed, because the defendant is pleading guilty to possession of child pornography, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States. Further, the defendant understands

that he is bound by his guilty plea regardless of any immigration consequences of the plea, and regardless of any advice the defendant has received from his counsel or others regarding those consequences. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or collateral attack of any kind challenging his guilty plea, conviction, or sentence, based on the immigration consequences of his guilty plea, conviction and sentence.

22. **No Undisclosed Terms.** The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

23. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

R. Matthew Price
United States Attorney

By

Dated: 8/22/2025

Ami Harshad Miller
Assistant United States Attorney
Missouri Bar No. 57711

I have consulted with my attorney and fully understand all of my rights with respect to the offenses charged in the superseding indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 8/22/25

Mahamud Tooxoow Mahamed
Defendant

I am defendant Mahamud Tooxoow Mahamed's attorney. I have fully explained to him his rights with respect to the offenses charged in the superseding indictment. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Mahamud Tooxoow Mahamed's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 8/22/25

Ian Lewis
Supervisory Assistant Federal Public Defender
Attorney for Defendant